**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: April 3, 2008                                    Decided: April 3, 2009
                                                    Errata Opinion: July 29, 2009)

Docket No.  06-4881-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Rescuecom Corp.,
                    *Plaintiff-Appellant*,

                    v.

Google Inc.,
                    *Defendant-Appellee*,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL, CALABRESI, WESLEY, *Circuit Judges*.

Appeal by Plaintiff Rescuecom Corp. from the judgment of the United States District Court for the Northern District of New York (Mordue, *Chief Judge*), dismissing Rescuecom's action against Google Inc. for trademark infringement, false designation of origin, and dilution under the Lanham Act, 15 U.S.C. § 1114 & 1125, pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim for relief, on the grounds that Google did not use Rescuecom's trademark in commerce within the meaning of the Lanham Act. The Court of

Appeals (Leval, *J.*) vacates and remands. The Complaint's allegations that Google's recommendation and sale of Rescuecom's mark to Google's advertisers, so as to trigger the appearance of their advertisements and links in a manner likely to cause consumer confusion when a Google user launches a search of Rescuecom's trademark, properly alleges a claim under the Lanham Act.

EDMUND J. GEGAN, Rescuecom Corporation, Syracuse, New York, for *Appellant*.

MICHAEL H. PAGE, Keker & Van Nest, LLP, San Francisco, California (Mark A. Lemley and Joseph C. Gratz, on the brief), for *Appellee*.

Jason Schultz, Corynne McSherry, and Fred Von Lohmann, Electronic Frontier Foundation, San Francisco, California, for *Amicus Curiae* Electronic Frontier Foundation.

Eric Goldman, Santa Clara University School of Law, Santa Clara, California, and Stacey Dogan, Northeastern University School of Law, Boston, Massachusetts, for *Amici Curiae* Intellectual Property Law Faculty.

Paul Alan Levy, Public Citizen Litigation Group, Washington, D.C., for *Amicus Curiae* Public Citizen.

Celia Goldwag Barenholtz, Janet L. Cullum, Jason M. Koral, and Christine K. Hsieh, Cooley Godward Kronish LLP, New York, New York, for *Amici Curiae* Yahoo! Inc., AOL LLC, and eBay Inc.

LEVAL, *Circuit Judge*:

Appeal by Plaintiff Rescuecom Corp. from a judgment of the United States District Court

for the Northern District of New York (Mordue, *Chief Judge*) dismissing its action against Google, Inc., under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Rescuecom's Complaint alleges that Google is liable under §§ 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 & 1125, for infringement, false designation of origin, and dilution of Rescuecom's eponymous trademark. The district court believed the dismissal of the action was compelled by our holding in *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400 (2d Cir. 2005) ("*1-800*"), because, according to the district court's understanding of that opinion, Rescuecom failed to allege that Google's use of its mark was a "use in commerce" within the meaning of § 45 of the Lanham Act, 15 U.S.C. § 1127. We believe this misunderstood the holding of *1-800*. While we express no view as to whether Rescuecom can prove a Lanham Act violation, an actionable claim is adequately alleged in its pleadings. Accordingly, we vacate the judgment dismissing the action and remand for further proceedings.

## BACKGROUND

As this appeal follows the grant of a motion to dismiss, we must take as true the facts alleged in the Complaint and draw all reasonable inferences in favor of Rescuecom. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 165 (2d Cir. 2005). Rescuecom is a national computer service franchising company that offers on-site computer services and sales. Rescuecom conducts a substantial amount of business over the Internet and receives between 17,000 to 30,000 visitors to its website each month. It also advertises over the Internet, using many web-based services, including those offered by Google. Since 1998, "Rescuecom" has been a registered federal trademark, and there is no dispute as to its validity.

Google operates a popular Internet search engine, which users access by visiting www.google.com. Using Google's website, a person searching for the website of a particular entity in trade (or simply for information about it) can enter that entity's name or trademark into Google's search engine and launch a search. Google's proprietary system responds to such a search request in two ways. First, Google provides a list of links to websites, ordered in what Google deems to be of descending relevance to the user's search terms based on its proprietary algorithms. Google's search engine assists the public not only in obtaining information about a provider, but also in purchasing products and services. If a prospective purchaser, looking for goods or services of a particular provider, enters the provider's trademark as a search term on Google's website and clicks to activate a search, within seconds, the Google search engine will provide on the searcher's computer screen a link to the webpage maintained by that provider (as well as a host of other links to sites that Google's program determines to be relevant to the search term entered). By clicking on the link of the provider, the searcher will be directed to the provider's website, where the searcher can obtain information supplied by the provider about its products and services and can perhaps also make purchases from the provider by placing orders.

The second way Google responds to a search request is by showing context-based advertising. When a searcher uses Google's search engine by submitting a search term, Google may place advertisements on the user's screen. Google will do so if an advertiser, having determined that its ad is likely to be of interest to a searcher who enters the particular term, has purchased from Google the placement of its ad on the screen of the searcher who entered that search term. What Google places on the searcher's screen is more than simply an advertisement.

4

It is also a link to the advertiser's website, so that in response to such an ad, if the searcher clicks on the link, he will open the advertiser's website, which offers not only additional information about the advertiser, but also perhaps the option to purchase the goods and services of the advertiser over the Internet. Google uses at least two programs to offer such context-based links: AdWords and Keyword Suggestion Tool.

AdWords is Google's program through which advertisers purchase terms (or keywords). When entered as a search term, the keyword triggers the appearance of the advertiser's ad and link. An advertiser's purchase of a particular term causes the advertiser's ad and link to be displayed on the user's screen whenever a searcher launches a Google search based on the purchased search term.[1] Advertisers pay Google based on the number of times Internet users "click" on the advertisement, so as to link to the advertiser's website. For example, using Google's AdWords, Company Y, a company engaged in the business of furnace repair, can cause Google to display its advertisement and link whenever a user of Google launches a search based on the search term, "furnace repair." Company Y can also cause its ad and link to appear whenever a user searches for the term "Company X," a competitor of Company Y in the furnace repair business. Thus, whenever a searcher interested in purchasing furnace repair services from Company X launches a search of the term X (Company X's trademark), an ad and link would appear on the searcher's screen, inviting the searcher to the furnace repair services of X's competitor, Company Y. And if the searcher clicked on Company Y's link, Company Y's

---

[1]Although we generally refer to a single advertiser, there is no limit on the number of advertisers who can purchase a particular keyword to trigger the appearance of their ads.

5

website would open on the searcher's screen, and the searcher might be able to order or purchase Company Y's furnace repair services.

In addition to Adwords, Google also employs Keyword Suggestion Tool, a program that recommends keywords to advertisers to be purchased. The program is designed to improve the effectiveness of advertising by helping advertisers identify keywords related to their area of commerce, resulting in the placement of their ads before users who are likely to be responsive to it. Thus, continuing the example given above, if Company Y employed Google's Keyword Suggestion Tool, the Tool might suggest to Company Y that it purchase not only the term "furnace repair" but also the term "X," its competitor's brand name and trademark, so that Y's ad would appear on the screen of a searcher who searched Company X's trademark, seeking Company X's website.

Once an advertiser buys a particular keyword, Google links the keyword to that advertiser's advertisement. The advertisements consist of a combination of content and a link to the advertiser's webpage. Google displays these advertisements on the search result page either in the right margin or in a horizontal band immediately above the column of relevance-based search results. These advertisements are generally associated with a label, which says "sponsored link." Rescuecom alleges, however, that a user might easily be misled to believe that the advertisements which appear on the screen are in fact part of the relevance-based search result and that the appearance of a competitor's ad and link in response to a searcher's search for Rescuecom is likely to cause trademark confusion as to affiliation, origin, sponsorship, or approval of service. This can occur, according to the Complaint, because Google fails to label

the ads in a manner which would clearly identify them as purchased ads rather than search results. The Complaint alleges that when the sponsored links appear in a horizontal bar at the top of the search results, they may appear to the searcher to be the first, and therefore the most relevant, entries responding to the search, as opposed to paid advertisements.

Google's objective in its AdWords and Keyword Suggestion Tool programs is to sell keywords to advertisers. Rescuecom alleges that Google makes 97% of its revenue from selling advertisements through its AdWords program. Google therefore has an economic incentive to increase the number of advertisements and links that appear for every term entered into its search engine.

Many of Rescuecom's competitors advertise on the Internet. Through its Keyword Suggestion Tool, Google has recommended the Rescuecom trademark to Rescuecom's competitors as a search term to be purchased. Rescuecom's competitors, some responding to Google's recommendation, have purchased Rescuecom's trademark as a keyword in Google's AdWords program, so that whenever a user launches a search for the term "Rescuecom," seeking to be connected to Rescuecom's website, the competitors' advertisement and link will appear on the searcher's screen. This practice allegedly allows Rescuecom's competitors to deceive and divert users searching for Rescuecom's website. According to Rescuecom's allegations, when a Google user launches a search for the term "Rescuecom" because the searcher wishes to purchase Rescuecom's services, links to websites of its competitors will appear on the searcher's screen in a manner likely to cause the searcher to believe mistakenly that a competitor's advertisement (and website link) is sponsored by, endorsed by, approved by, or affiliated with Rescuecom.

The District Court granted Google's 12(b)(6) motion and dismissed Rescuecom's claims. The court believed that our *1-800* decision compels the conclusion that Google's allegedly infringing activity does not involve use of Rescuecom's mark in commerce, which is an essential element of an action under the Lanham Act. The district court explained its decision saying that even if Google employed Rescuecom's mark in a manner likely to cause confusion or deceive searchers into believing that competitors are affiliated with Rescuecom and its mark, so that they believe the services of Rescuecom's competitors are those of Rescuecom, Google's actions are not a "use in commerce" under the Lanham Act because the competitor's advertisements triggered by Google's programs did not exhibit Rescuecom's trademark. The court rejected the argument that Google "used" Rescuecom's mark in recommending and selling it as a keyword to trigger competitor's advertisements because the court read *1-800* to compel the conclusion that this was an internal use and therefore cannot be a "use in commerce" under the Lanham Act.

## DISCUSSION

"This Court reviews *de novo* a district court's grant of a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6)." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1197 (2d Cir. 1996). When reviewing a motion to dismiss, a court must "accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (citations omitted).

**I. Google's Use of Rescuecom's Mark Was a "Use in Commerce"**

Our court ruled in *1-800* that a complaint fails to state a claim under the Lanham Act

unless it alleges that the defendant has made "use in commerce" of the plaintiff's trademark as the term "use in commerce" is defined in 15 U.S.C. § 1127. The district court believed that this case was on all fours with *1-800*, and that its dismissal was required for the same reasons as given in *1-800*. We believe the cases are materially different. The allegations of Rescuecom's complaint adequately plead a use in commerce.

In *1-800*, the plaintiff alleged that the defendant infringed the plaintiff's trademark through its proprietary software, which the defendant freely distributed to computer users who would download and install the program on their computer. The program provided contextually relevant advertising to the user by generating pop-up advertisements to the user depending on the website or search term the user entered in his browser. *Id.* at 404-05. For example, if a user typed "eye care" into his browser, the defendant's program would randomly display a pop-up advertisement of a company engaged in the field of eye care. Similarly, if the searcher launched a search for a particular company engaged in eye care, the defendant's program would display the pop-up ad of a company associated with eye care. *See id.* at 412. The pop-up ad appeared in a separate browser window from the website the user accessed, and the defendant's brand was displayed in the window frame surrounding the ad, so that there was no confusion as to the nature of the pop-up as an advertisement, nor as to the fact that the defendant, not the trademark owner, was responsible for displaying the ad, in response to the particular term searched. *Id.* at 405.

Sections 32 and 43 of the Act, which we also refer to by their codified designations, 15 U.S.C. §§1114 & 1125, *inter alia,* impose liability for unpermitted "use in commerce" of

another's mark which is "likely to cause confusion, or to cause mistake, or to deceive," §1114, "as to the affiliation . . . or as to the origin, sponsorship or approval of his or her goods [or] services . . . by another person." §1125(a)(1)(A). The *1-800* opinion looked to the definition of the term "use in commerce" provided in § 45 of the Act, 15 U.S.C. § 1127. That definition provides in part that "a mark shall be deemed to be in use in commerce . . . (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." 15 U.S.C. § 1127.[2] Our court found that the plaintiff failed to show that the defendant made a "use in commerce" of the plaintiff's mark, within that definition.

At the outset, we note two significant aspects of our holding in *1-800*, which distinguish it from the present case. A key element of our court's decision in *1-800* was that under the plaintiff's allegations, the defendant did not use, reproduce, or display the plaintiff's mark *at all*. The search term that was alleged to trigger the pop-up ad was the plaintiff's *website address*. *1-800* noted, notwithstanding the similarities between the website address and the mark, that the website address was not used or claimed by the plaintiff as a trademark. Thus, the transactions alleged to be infringing were not transactions involving use of the plaintiff's trademark. *Id.* at 408-09.[3] *1-800* suggested in dictum that is highly relevant to our case that had the defendant

---

[2]The Appendix to this opinion discusses the applicability of § 1127's definition of "use in commerce" to sections of the Lanham Act proscribing infringement.

[3]We did not imply in *1-800* that a website can never be a trademark. In fact, the opposite is true. *See* Trademark Manual of Examining Procedures § 1209.03(m) (5th ed. 2007) ("A mark comprised of an Internet domain name is registrable as a trademark or service mark only if it functions as an identifier of the source of goods or services."); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (Section 43(a) of the Lanham Act protects unregistered trademarks as long as the mark could qualify for registration under the Lanham Act.); *Thompson*

used the plaintiff's *trademark* as the trigger to pop-up an advertisement, such conduct might, depending on other elements, have been actionable. 414 F.3d at 409 & n.11.

Second, as an alternate basis for its decision, *1-800* explained why the defendant's program, which might randomly trigger pop-up advertisements upon a searcher's input of the plaintiff's website address, did not constitute a "use in commerce," as defined in § 1127. *Id.* at 408-09. In explaining why the plaintiff's mark was not "used or displayed in the sale or advertising of services," *1-800* pointed out that, under the defendant's program, advertisers could not request or purchase keywords to trigger their ads. *Id.* at 409, 412. Even if an advertiser wanted to display its advertisement to a searcher using the plaintiff's trademark as a search term, the defendant's program did not offer this possibility. In fact, the defendant "did not disclose the proprietary contents of [its] directory to its advertising clients . . . ." *Id.* at 409. In addition to not selling trademarks of others to its customers to trigger these ads, the defendant did not "otherwise manipulate which category-related advertisement will pop up in response to any particular terms on the internal directory." *Id.* at 411. The display of a particular advertisement was controlled by the category associated with the website or keyword, rather than the website or keyword itself. The defendant's program relied upon categorical associations such as "eye care" to select a pop-up ad randomly from a predefined list of ads appropriate to that category. To the extent that an advertisement for a competitor of the plaintiff was displayed when a user opened the plaintiff's website, the trigger to display the ad was not based on the defendant's sale or recommendation of

---

*Med. Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 215-216 (2d Cir. 1985) (same). The question whether the plaintiff's website address was an unregistered trademark was never properly before the *1-800* court because the plaintiff did not claim that it used its website address as a trademark.

a particular trademark.

The present case contrasts starkly with those important aspects of the *1-800* decision. First, in contrast to *1-800*, where we emphasized that the defendant made no use whatsoever of the plaintiff's trademark, here what Google is recommending and selling to its advertisers is Rescuecom's trademark. Second, in contrast with the facts of *1-800* where the defendant did not "use or display," much less sell, trademarks as search terms to its advertisers, here Google displays, offers, and sells Rescuecom's mark to Google's advertising customers when selling its advertising services. In addition, Google encourages the purchase of Rescuecom's mark through its Keyword Suggestion Tool. Google's utilization of Rescuecom's mark fits literally within the terms specified by 15 U.S.C. § 1127. According to the Complaint, Google uses and sells Rescuecom's mark " in the sale . . . of [Google's advertising] services . . . rendered in commerce." § 1127.

Google, supported by amici, argues that *1-800* suggests that the inclusion of a trademark in an internal computer directory cannot constitute trademark use. Several district court decisions in this Circuit appear to have reached this conclusion. *See e.g.*, *S&L Vitamins, Inc. v. Australian Gold*, *Inc.*, 521 F. Supp. 2d 188, 199-202 (E.D.N.Y. 2007) (holding that use of a trademark in metadata did not constitute trademark use within the meaning of the Lanham Act because the use "is strictly internal and not communicated to the public")*; Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 415 (S.D.N.Y. 2006) (holding that the internal use of a keyword to trigger advertisements did not qualify as trademark use). This over-reads the *1-800* decision. First, regardless of whether Google's use of Rescuecom's mark in its

internal search algorithm could constitute an actionable trademark use, Google's recommendation and sale of Rescuecom's mark to its advertising customers are not internal uses. Furthermore, *1-800* did not imply that use of a trademark in a software program's internal directory precludes a finding of trademark use. Rather, influenced by the fact that the defendant was not using the plaintiff's trademark at all, much less using it as the basis of a commercial transaction, the court asserted that the particular use before it did not constitute a use in commerce. *See 1-800*, 414 F.3d at 409-12. We did not imply in *1-800* that an alleged infringer's use of a trademark in an internal software program insulates the alleged infringer from a charge of infringement, no matter how likely the use is to cause confusion in the marketplace. If we were to adopt Google and its amici's argument, the operators of search engines would be free to use trademarks in ways designed to deceive and cause consumer confusion.[4] This is surely neither within the intention nor the letter of the Lanham Act.

Google and its amici contend further that its use of the Rescuecom trademark is no different from that of a retail vendor who uses "product placement" to allow one vender to benefit from a competitors' name recognition. An example of product placement occurs when a store-brand generic product is placed next to a trademarked product to induce a customer who specifically sought out the trademarked product to consider the typically less expensive, generic

---

[4]For example, instead of having a separate "sponsored links" or paid advertisement section, search engines could allow advertisers to pay to appear at the top of the "relevance" list based on a user entering a competitor's trademark—a functionality that would be highly likely to cause consumer confusion. Alternatively, sellers of products or services could pay to have the operators of search engines automatically divert users to their website when the users enter a competitor's trademark as a search term. Such conduct is surely not beyond judicial review merely because it is engineered through the internal workings of a computer program.

brand as an alternative. *See 1-800*, 414 F.3d at 411. Google's argument misses the point. From the fact that proper, non-deceptive product placement does not result in liability under the Lanham Act, it does not follow that the label "product placement" is a magic shield against liability, so that even a deceptive plan of product placement designed to confuse consumers would similarly escape liability. It is not by reason of absence of a use of a mark in commerce that benign product placement escapes liability; it escapes liability because it is a benign practice which does not cause a likelihood of consumer confusion. In contrast, if a retail seller were to be paid by an off-brand purveyor to arrange product display and delivery in such a way that customers seeking to purchase a famous brand would receive the off-brand, believing they had gotten the brand they were seeking, we see no reason to believe the practice would escape liability merely because it could claim the mantle of "product placement." The practices attributed to Google by the Complaint, which at this stage we must accept as true, are significantly different from benign product placement that does not violate the Act.

Unlike the practices discussed in *1-800*, the practices here attributed to Google by Rescuecom's complaint are that Google has made use in commerce of Rescuecom's mark. Needless to say, a defendant must do more than use another's mark in commerce to violate the Lanham Act. The gist of a Lanham Act violation is an unauthorized use, which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, . . . or as to the origin, sponsorship, or approval of . . . goods [or] services." *See* 15 U.S.C. § 1125(a); *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508-09 (2d Cir. 1997). We have no idea whether Rescuecom can prove that Google's use of Rescuecom's trademark in its AdWords program causes

14

likelihood of confusion or mistake. Rescuecom has alleged that it does, in that would-be purchasers (or explorers) of its services who search for its website on Google are misleadingly directed to the ads and websites of its competitors in a manner which leads them to believe mistakenly that these ads or websites are sponsored by, or affiliated with Rescuecom. This is particularly so, Rescuecom alleges, when the advertiser's link appears in a horizontal band at the top of the list of search results in a manner which makes it appear to be the most relevant search result and not an advertisement. What Rescuecom alleges is that by the manner of Google's display of sponsored links of competing brands in response to a search for Rescuecom's brand name (which fails adequately to identify the sponsored link as an advertisement, rather than a relevant search result), Google creates a likelihood of consumer confusion as to trademarks. If the searcher sees a different brand name as the top entry in response to the search for "Rescuecom," the searcher is likely to believe mistakenly that the different name which appears is affiliated with the brand name sought in the search and will not suspect, because the fact is not adequately signaled by Google's presentation, that this is not the most relevant response to the search. Whether Google's actual practice is in fact benign or confusing is not for us to judge at this time. We consider at the 12(b)(6) stage only what is alleged in the Complaint.

We conclude that the district court was mistaken in believing that our precedent in *1-800* requires dismissal.

**CONCLUSION**

The judgment of the district court is vacated and the case is remanded for further proceedings.

**APPENDIX**

**On the Meaning of "Use in Commerce" in Sections 32 and 43 of the Lanham Act[5]**

In *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400 (2d Cir. 2005) ("*1-800*"), our court followed the reasoning of two district court opinions from other circuits, *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723 (E.D. Va. 2003) and *Wells Fargo & Co., v. WhenU.com, Inc.*, 293 F. Supp. 2d 734 (E.D. Mich. 2003), which dismissed suits on virtually identical claims against the same defendant. Those two district courts ruled that the defendant's conduct was not actionable under §§ 32 & 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 & 1125(a), even assuming that conduct caused likelihood of trademark confusion, because the defendant had not made a "use in commerce" of the plaintiff's mark, within the definition of that phrase set forth in § 45 of the Lanham Act, 15 U.S.C. § 1127. In quoting definitional language of § 1127 that is crucial to their holdings, however, *U-Haul* and *Wells Fargo* overlooked and omitted portions of the statutory text which make clear that the definition provided in § 1127 was not intended by Congress to apply in the manner that the decisions assumed.

Our court's ruling in *1-800* that the Plaintiff had failed to plead a viable claim under §§ 1114 & 1125(a) was justified by numerous good reasons and was undoubtedly the correct result. In addition to the questionable ground derived from the district court opinions, which had overlooked key statutory text, our court's opinion cited other highly persuasive reasons for dismissing the action – among them that the plaintiff did not claim a trademark in the term that

---

[5]In this discussion, all iterations of the phrase "use in commerce" whether in the form of a noun (a "use in commerce"), a verb ("to use in commerce"), or adjective ("used in commerce"), are intended without distinction as instances of that phrase.

17

served as the basis for the claim of infringement; nor did the defendant's actions cause any likelihood of confusion, as is crucial for such a claim.

We proceed to explain how the district courts in *U-Haul* and *Wells Fargo* adopted reasoning which overlooked crucial statutory text that was incompatible with their ultimate conclusion. Section 43(a), codied at 15 U.S.C. § 1125(a), imposes liability on "any person who, on or in connection with any goods or services, *uses in commerce* any word, term, name, symbol, or device . . . which– (A) is likely to cause confusion . . . ." (emphasis added). Section 32, codified at 15 U.S.C. § 1114, similarly imposes liability on one who "without the consent of the registrant–(a) *use[s] in commerce* any reproduction . . . [or] copy . . .of a registered mark . . . in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive" (emphasis added). To determine the meaning of the phrase "uses in commerce," which appears in both sections, the *U-Haul* and *Wells Fargo* courts quite understandably looked to the definition of the term "use in commerce," set forth among the Act's definitions in § 45, codified at 15 U.S.C. § 1127. That definition, *insofar as quoted by the court*s, stated, with respect to services, that a mark shall be deemed to be "used in commerce only when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." *Wells Fargo*, 293 F. Supp. 2d at 757 (internal quotations omitted); *U-Haul*, 279 F. Supp. 2d at 727 (specifying a similar requirement with respect to goods). Adhering to this portion of the definition, and determining that on the particular facts of the case, the defendant had not used or displayed a mark in the sale or advertising of services, those courts concluded that the defendant's conduct was not within the scope of the Act.

18

In quoting the § 1127 definition, however, those district courts overlooked and omitted two portions of the statutory text, which we believe make clear that the definition provided in § 1127 is not intended to apply to §§ 1114 & 1125(a). First, those courts, no doubt reasonably, assumed that the definition of "use in commerce" set forth in § 1127 necessarily applies to all usages of that term throughout the Act. This was, however, not quite accurate. Section 1127 does not state flatly that the defined terms have the assigned meanings when used in the statute. The definition is more guarded and tentative. It states rather that the terms listed shall have the given meanings "unless the contrary is plainly apparent from the context."

The second part of § 1127 which those courts overlooked was the opening phrase of the definition of "use in commerce," which makes it "plainly apparent from the context" that the full definition set forth in § 1127 cannot apply to the infringement sections. The definition in § 1127 begins by saying, "The term 'use in commerce' means the *bona fide* use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127 (emphasis added). The requirement that a use be a *bona fide* use in the ordinary course of trade in order to be considered a "use in commerce" makes clear that the particular definition was not intended as a limitation on conduct of an accused infringer that might cause liability. If § 1127's definition is applied to the definition of conduct giving rise to liability in §§ 1114 and 1125, this would mean that an accused infringer would *escape* liability, notwithstanding deliberate deception, precisely because he acted *in bad faith*. A bad faith infringer would not have made a use in commerce, and therefore a necessary element of liability would be lacking. Liability would fall only on those defendants who acted *in good faith*. We think it inconceivable that the statute could have

19

intended to exempt infringers from liability because they acted in bad faith. Such an interpretation of the statute makes no sense whatsoever. It must be that Congress intended § 1127's definition of "use in commerce" to apply to other iterations of the term "use in commerce," (as we explore below) and not to the specification of conduct by an alleged infringer which causes imposition of liability.[6]

A more detailed examination of the construction of the Lanham Act, and its historical evolution, demonstrates how this unlikely circumstance came to be. The Act employs the term "use in commerce" in two very different contexts. The first context sets the standards and circumstances under which the owner of a mark can qualify to *register* the mark and to receive the *benefits* and *protection* provided by the Act. For example, 15 U.S.C. § 1051 provides that "[t]he owner of a trademark *used in commerce* may request registration of its trademark on the principal register," thereby receiving the benefits of enhanced protection (emphasis added).[7] This part of the statute describes the conduct which the statute seeks to encourage, reward, and protect. The second context in which the term "use in commerce" appears is at the opposite pole. As exemplified in §§ 1114 & 1125(a), the term "use in commerce," as quoted above, also

---

[6] The *Wells Fargo* decision, which followed and cited *U-Haul*, unlike *U-Haul*, did quote the part of § 1127 which requires a "bona fide use of a mark in the ordinary course of trade," 293 F. Supp. 2d at 758, but failed to note the incompatibility of that requirement with a section defining prohibited actionable conduct.

[7] In addition to § 1051, a non-exhaustive list of other sections that employ the term "use in commerce" in the same general way, in defining what is necessary to secure the benefits of the Act, include § 1065 (incontestability of a mark); § 1058 (renewal of a mark), § 1091 (eligibility for the supplemental register); § 1112 (registration of a mark in plurality of classes); and § 1062 (republication of marks registered under acts prior to the Lanham Act).

appears as part of the Act's definition of reprehensible conduct, *i.e.,* the conduct which the Act identifies as infringing of the rights of the trademark owner, and for which it imposes liability.

When one considers the entire definition of "use in commerce" set forth in § 1127, it becomes plainly apparent that this definition was intended to apply to the Act's use of that term in defining favored conduct, which qualifies to receive the protection of the Act. The definition makes perfect sense in this context. In order to qualify to register one's mark and receive the enhanced protections that flow from registration (giving the world notice of one's exclusive rights in the mark), the owner must have made "bona fide use of the mark in the ordinary course of trade, and not merely to reserve a right in the mark." *Id.* § 1127. The bona fide "use" envisioned is, with respect to "goods, when [the mark] is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto . . . , and the goods are sold or transported in commerce; and on services when [the mark] is used or displayed in the sale or advertising of services . . . rendered in commerce." *Id.* This definition sensibly insures that one who in good faith places his mark on goods or services in commerce qualifies for the Act's protection. In contrast, it would make no sense whatsoever for Congress to have insisted, in relation to § 1114 for example, that one who "without the consent of the registrant . . . use[d]. . . [a] counterfeit . . . of a registered mark in connection with the sale . . . of . . . goods [thereby] caus[ing] confusion" will be liable to the registrant *only if* his use of the counterfeit was a "bona fide use of [the] mark in the ordinary course of trade." *Id.* §§ 1114 & 1127. Such a statute would perversely penalize only the fools while protecting the knaves, which was surely not what Congress intended.

21

The question then arises how it came to pass that the sections of the statute identifying conduct giving rise to liability included the phrase "use in commerce" as an essential element of liability. This answer results in part from a rearrangement of this complex statute, which resulted in joining together words which, as originally written, were separated from one another. The first incidence of employment of the phrase "use in commerce" in § 1114 occurred in 1962 as the result of a mere "rearrangement" of sections, not intended to have substantive significance, which brought together the jurisdiction-invoking phrase, "in commerce" with the verb "use." Prior to the 1962 rearrangement, the term "use in commerce" appeared as an essential element of a trademark owner's qualification for registration and for the benefits of the Act, but did not appear as an essential element of a defendant's conduct necessary for liability. The Act frequently employs the term "in commerce" for the distinct purpose of invoking Congress's Commerce Clause jurisdiction and staying within its limits.[8] The statute also frequently employs the word "use," either as a noun or verb, because that word so naturally and aptly describes what one does with a trademark. Not surprisingly, in the extensive elaborate course of drafting, revision, and rearrangement which the Act has undergone from time to time, as explained below, the words "use" and "in commerce" came into proximity with each other in circumstances where there was no intent to invoke the specialized restrictive meaning given by § 1127. In 1988, when Congress enacted the present form of § 1127's definition, which was designed to deny registration to an owner who made merely token use of his mark, the accompanying

---

[8]Section 1127 defines "commerce" to mean "all commerce which may lawfully be regulated by Congress."

22

Congressional report made clear that the definition was understood as applying only to the requirements of qualification for registration and other benefits of the Act, and not to conduct causing liability. We briefly trace the history of this evolution below, to show that the restrictive definition of "use in commerce" set forth in § 1127 never was intended as a restriction on the types of conduct that could result in liability.

*History of the Phrase "Use in Commerce" in the Lanham Act*

In 1879 in *The Trade-Mark Cases*, 100 U.S. 82 (1879), the Supreme Court struck down the existing trademark statutes passed in the 1870s because the Copyright Clause of the Constitution was not a proper basis of Congressional authority to regulate trademarks. While ruling that the Copyright Clause did not give Congress authority to protect trademarks, the Court specified that if Congress wished to invoke the Commerce Clause to justify its assertion of the power to regulate trademarks, it needed to invoke that authority "on the face of the law." *Id.* at 96. Two years later, Congress enacted a statute to "authorize the registration of trade-marks and protect the same," Act of March 3, 1881, 21 Stat. 502, which explicitly and repeatedly invoked Congress's Commerce Clause power on "the face of the law," using language virtually identical to the constitutional grant of power.[9]

---

[9]For example, in specifying how a trademark owner would qualify for the benefits of federal registration of the trademark, the statute stated, "[t]hat owners of trade-marks *used in commerce with foreign nations, or with the Indian tribes*, . . . may obtain registration of [] trade-marks." *Id.* at 502 (emphasis added); *see also* Act of February 20, 1905, 33 Stat. 724, 724 ("[T]he owner of a trademark used in commerce with foreign nations, or among the several States, or with Indian Tribes . . . may obtain [trademark] registration."). And in specifying the conduct that would incur liability for infringement, the Act similarly prescribed that an aggrieved party could "enjoin the wrongful use of such trade-mark used in foreign commerce or commerce with Indian tribes." Act of March 3, 1881, 21 Stat. 502, 504; *see also* Act of February 20, 1905,

A major revision to federal trademark law came in 1946 with the passage of the Lanham Act. Congressman Fritz Lanham, Chairman of the Subcommittee on Trade-Marks of the House Committee on Patents, had first introduced his bill, HR 9041, in 1938. At the time, in order to qualify to register a trademark and receive the resulting protections, a trademark owner needed to "affix" his mark to goods in interstate commerce. *See* Act of February 20, 1905, 33 Stat. 724, 724 (stating that one of the requirements for registration is that the trademark owner must file an application that states the "mode in which [the trademark] is applied and affixed to goods"); *see also Western Stove Co. v. Geo. D. Roper Corp.*, 82 F. Supp. 206, 216 (S.D. Cal. 1949) (stating that to obtain a common law trademark or a trademark under the Act of 1905, "it is clear that the trade-mark had to be affixed substantially either to the product, or the container thereof"). The 1939 version of Lanham's bill thus defined "affixation," stating that a "trademark shall be deemed to be affixed to an article when it is placed in any manner in or upon either the article or its container or display or upon tags or labels or is otherwise used in the advertisement or sale thereof." H.R. 4744, 76th Cong. § 46 (1st Sess. 1939). The version presented in Congress two years later in 1941, H.R. 5461, instead of defining "affixation," introduced the less complicated, more accommodating definition of "use in commerce" as the conduct by which an owner would qualify to register a mark. The bill included in § 45 (which eventually became § 1127) a definition of "use[] in commerce," which was similar to the definition of affixation in the prior

---

33 Stat. 724, 728 ("Any person who shall, without consent of the owner thereof, reproduce, counterfeit, copy, or colorably imitate any such trade-mark . . . and shall use or shall have used, such reproduction, counterfeit, copy, or colorable imitation in commerce among the several States, or with a foreign nation, or with the Indian tribes, shall be liable".).

H.R. 4744 in 1939, but more expansive, including both goods and services.

This definition provided,

> For purposes of this Act a mark shall be deemed to be used in commerce (a) on goods when it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto and the goods are sold or transported in commerce and (b) on services when used or displayed in the sale of advertising of services in commerce.

H.R. 5461, 77th Cong. § 45 (1st Sess. 1941). This text of § 45 of the 1941 bill was eventually enacted in the 1946 version in substantially the same form, and in later codification became the definition set forth in § 1127. It is important to note that in the 1941 bill, in which first appeared the defined term, "used in commerce," that term served as a requirement for registration, but the term nowhere appeared in the language defining conduct that would constitute infringement under § 32. Section 32, which defined infringement, made reference to "commerce" but did not employ the defined term "used in commerce."

In the form in which the Act was eventually passed in 1946, the term "used in commerce" continued to be a prerequisite to registration, but remained generally absent, with one small exception, from the statutory language defining infringement. Section 32, eventually codified as § 1114, at the time contained no instance of the term. Section 43(a), eventually codified as § 1125(a), provided liability for infringing conduct by "[a]ny person who shall . . . cause or procure the [trademark] to be transported *or* used in commerce *or* deliver the [trademark] to any carrier to be transported or used." *See* Lanham Act, 60 Stat. 427, 441 (1946) (emphasis added). Thus, the Act allowed the imposition of liability on any infringer under § 32 without regard to whether he "used in commerce" the mark, and under § 43(a) on any infringer who "cause[d] or procure[d]"

25

the transportation of a mark in commerce, or who "deliver[ed a mark] to any carrier to be transported," as well as to one who "cause[d] or procure[d]" the mark or delivered it to a carrier to be "used in commerce." Regardless of whether the "use in commerce" language in § 43(a) was intended to carry the definition in § 45, the Lanham Act as passed in 1946, on any reading, did not restrict liability for infringement to those who "used in commerce," as defined in § 45's restrictive terms. Such a "use in commerce" was simply one of several ways to satisfy one of several elements of a cause of action under § 43(a). By contrast, to justify imposition of liability on an infringer, the Act *required*, as an element of the cause of action, that the infringer "cause the [infringing] goods or services to enter into commerce" — a jurisdictional predicate for Congress's power to legislate in this area. *See id.* Thus, on the question whether the definition set forth in § 45 (§ 1127) should be understood as applying to, and thus restricting, conduct causing liability, one of the leading commentators on trademark law notes,

> The Lanham Act § 45 narrowing definition of what constitutes "use in commerce" is just a relaxed remnant of trademark law's once-hyper-technical "affixation" requirement. This statutory anachronism certainly was never intended to limit the scope of "uses" that would constitute infringement.

4 McCarthy on Trademarks and Unfair Competition § 23:11.50 (4th ed. 1994 & updated 2008).

*The Amendment of § 1114 in 1962*

A confusing change in statutory diction occurred in 1962 when Congress amended § 1114. The purpose of the amendment was to broaden liability for infringement. Previously, the statutory requirement of confusion, mistake, or deception applied only with respect to "purchasers as to the source of origin of such goods or services." *See* 1 McCarthy § 5:6 (4th ed.

1994 & updated 2008). Congress eliminated this requirement to expand the scope of deceptive, or misleading conduct that could constitute infringement. *Id.* (noting that this amendment "has been viewed as expanding the range of actions that can constitute infringement of a trademark by not limiting it to confusion of purchasers and not limiting it to confusion as to the source of goods"). At the same time as making this broadening substantive change, the 1962 amendment made structural changes to the order of the language in § 1114. *See* H.R. Rep. No. 1108, 87th Cong. at 8 (1961). Previously, § 1114 had listed a series of actions which, when taken by "any person . . . *in commerce*" would cause liability. Among the liability-causing actions listed was, under clause (a), a person's "*use*, without the consent of the registrant, [of] any reproduction . . . ." Lanham Act, 60 Stat. 427, 437 § 32 (1946) (emphasis added). Thus, in the pre-1962 version, the terms "use" and "in commerce" occurred in separate clauses. One of the changes, which is not described in the House or Senate Reports as having any substantive significance, was a rearrangement of the order of words so that "use" and "in commerce" came to appear side by side in the amended version, rather than in separate clauses. In its amended form, it read "[a]ny person who shall, without the consent of the registrant (a) *use in commerce* any reproduction . . . shall be liable in a civil action." 76 Stat. 769, 773 (1962) (emphasis added). As the result of the rearrangement, the consolidated phrase "use in commerce" appeared for the first time in § 1114. The House and Senate reports describe these amendments as intended simply to "rearrang[e] the language." *See* H.R. Rep. No. 1108, 87th Cong. at 8 (1961); S. Rep. No. 1685, 86th Cong. 1685 at 8 (1960). The only change to § 1114 specifically discussed in the Report was the deletion of the phrase "purchasers as to the source of such goods or services" for the stated purpose of

broadening liability. *Id.* It would be unreasonable to construe mere "rearrange[ment]" of language in § 1114 as having intended to convert the broad liability-imposing term, "use" into a restrictive, defined term, which had previously applied only to a trademark owner's qualification for registration of the mark — especially when Congress made no mention beyond describing the change as a rearrangement. *See Whitman v. Am. Trucking Assoc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes.").[10]

*The 1988 Amendment to § 1127*

If there was any doubt prior to 1988 on the question whether the narrowing definition of "use in commerce" set forth in § 1127, was intended to apply to the utilization of that phrase in the sections providing for the liability of infringers, the doubt was put to rest by the Trademark Law Revision Act of 1988,[11] which inserted into § 1127 the requirement that a "use in commerce" be a "bona fide use of a mark in the ordinary course of trade and not merely made to reserve a right in a mark." This was part of a change intended to bring the federal trademark registration system into harmony with the registration system of other nations, see Pub. L. No. 100-667, 102 Stat. 3935 (Nov. 16, 1988), by providing the possibility of reserving a trademark for intended future use. Previously, one could not establish exclusive rights to a mark, or

---

[10]In 1962, Congress also amended six paragraphs of § 1127's definitions of terms other than "use in commerce," but left the "use in commerce" definition intact. *See* Lanham Act, 75 Stat. 769, 774 (1962). Despite broadening infringement liability in § 1114, Congress did not redefine "use in commerce" as applying only to registration and protection, and not to infringement.

[11]The Trademark Law Revision Act of 1988 was enacted on November 16, 1988 and went into effect November 16, 1989. Some courts and commentators refer to this Act as the 1988 amendment while others refer to it as the 1989 amendment.

eligibility to register one's claim to the mark, except by using the mark in commerce. One who had a bona fide intent to use a mark in the future on a product not yet released into commerce could not be assured that, during product development preceding distribution of the product under the mark, another user might not establish a priority in the same mark. In at least one case in this Circuit, an attempt to reserve priority in a mark by making token use during the product development period had been found ineffective. *Procter & Gamble Co. v. Johnson & Johnson Inc.*, 485 F. Supp. 1185 (S.D.N.Y. 1979), *aff'd* 636 F.2d 1203 (2d Cir. 1980). The 1988 amendment provided relief by allowing applicants to file an intent to use application, by which they could reserve their priority in a mark for a limited period without making use of it in commerce. Pub. L. No. 100-667, § 103.

While these amendments provided relief in the form of effective reservation of a mark for a time on the basis of a filing of intent to use, registration of a mark under § 1051 continued to be limited to those who have in fact "used [the mark] in commerce." And the definition of "use in commerce" set forth in § 1127 was amended to require that the use be a "bona fide use . . . in the ordinary course of trade and not made merely to reserve a right in the mark." 15 U.S.C. § 1127. Those wishing to reserve a right in the mark were provided for by the new intent-to-use provisions. Actual registration, however, was reserved to mark owners making bona fide use in commerce. As noted above, this definition of "use in commerce" makes eminent good sense as a prerequisite for a mark owner to register the mark and claim the benefits the Act provides to the owners of marks. It makes no conceivable sense as a limitation shielding bad-faith abusers of the marks of others from liability for causing trademark confusion.

The Senate Report for the 1988 amendment confirms that the definition in § 1127 was meant to apply only to registering a mark rather than infringing one. The Senate Report explained that the "revised [use in commerce] definition is intended to apply to all aspects of the trademark registration process," and that "[c]learly, however, use of *any type* will continue to be considered in an infringement action." *See* S. Rep. 100-515 100th Cong. at 45 (1988) (emphasis added). This, of course, is consistent with the Lanham Act's intent to make actionable the deceptive and misleading use of marks in commerce—an intent which has not changed since the Lanham Act was first enacted. *See* Lanham Act, 60 Stat. 427, § 45 (1946); 15 U.S.C. § 1127. According to the Senate Report, a purpose in amending this section was to add "a reference to make clear that the section applies only to acts or practices which occur in [or] affect commerce." *See* S. Rep. 100-515 100th Cong. at 41 (1988). The amendment left only one reference to commerce in § 1125(a), which was the "uses in commerce" language. This term was thus employed in the 1988 revision to make clear that liability would be imposed for acts that occur in or affect commerce, i.e. those within Congress's Commerce Clause power. Thus, the term "uses in commerce" in the current § 1125(a) is intended to refer to a use that falls within Congress's commerce power, and not to the restrictive definition of "use in commerce," set forth in § 45 to define standards of qualification for an owner to register a mark and receive the benefits and protection of the Act.

It therefore appears that the history of the development of the Lanham Act confirms what is also indicated by a common-sense understanding of the provisions. The definition of the term "use in commerce" provided by § 1127, was intended to continue to apply, as it did when the

30

definition was conceived in the 1941 bill, to the sections governing qualification for registration and for the benefits of the Act. In that version, the term "use in commerce"did not appear in § 32, which established the elements of liability for infringing upon a federally registered mark. The eventual appearance of that phrase in that section did not represent an intention that the phrase carry the restrictive definition which defined an owner's entitlement to registration. The appearance rather resulted from happenstance pairing of the verb "use" with the term "in commerce," whose purpose is to claim the jurisdictional authority of the Commerce Clause. Section 1127, as noted, does not prescribe that its definitions necessarily apply throughout the Act. They apply "unless the contrary is plainly apparent from the context."

*The Interpretation of § 1127's Definition of "Use in Commerce"with Respect to Alleged*

*Infringers*

In light of the preceding discussion, how should courts today interpret the definition of "use in commerce" set forth in 15 U.S.C. § 1127, with respect to acts of infringement prescribed by §§ 1114 and 1125(a)? The foregoing review of the evolution of the Act seems to us to make clear that Congress did not intend that this definition apply to the sections of the Lanham Act which define infringing conduct. The definition was rather intended to apply to the sections which used the phrase in prescribing eligibility for registration and for the Act's protections. However, Congress does not enact intentions. It enacts statutes. And the process of enacting legislation is of such complexity that understandably the words of statutes do not always conform perfectly to the motivating intentions. This can create for courts difficult problems of interpretation. Because pertinent amendments were passed in 1962 and in 1988, and because the

31

1988 amendment did not change the pre-existing parts of the definition in § 1127, but merely

added a sentence, it seems useful to approach the question of the current meaning in two steps.

First, what did this definition mean between 1962 and 1988 – prior to the 1988 amendment?

Then, how was the meaning changed by the 1988 amendment?

Between 1962 and 1988, notwithstanding the likelihood shown by the legislative history

that Congress *intended* the definition to apply only to registration and qualification for benefits

and not to infringement, a court addressing the issue nonetheless would probably have concluded

that the section applied to alleged infringement, as well.  Section 1127 states that its definitions

apply "unless the contrary is plainly apparent from the context."  One who considered the

question at the time might well have wondered why Congress would have provided this

restrictive definition for acts of trademark infringement with the consequence that deceptive and

confusing uses of another's mark with respect to goods would escape liability if the conduct did

not include the placement of the mark on goods or their containers, displays, or sale documents,

and with respect to services if the conduct did not include the use or display of the mark in the

sale or advertising of the services.  It is easy to imagine perniciously confusing conduct involving

another's mark which does not involve placement of the mark in the manner specified in the

definition.  Nonetheless, in spite of those doubts, one could not have said it was"plainly apparent

from the context" that those restrictions did not apply to sections defining infringement.  In all

probability, therefore, a court construing the provision between 1962 and 1988 would have

concluded that in order to be actionable under §§ 1114 or 1125(a) the allegedly infringing

conduct needed to include placement of the mark in the manner specified in the definition of "use

32

in commerce" in § 1127.

The next question is how the meaning of the § 1127 definition was changed by the 1988 amendment, which, as noted, left the preexisting language about placement of the mark unchanged, but added a prior sentence requiring that a "use in commerce" be "a bona fide use in the ordinary course of trade, and not made merely to reserve a right in a mark."   While it is "plainly apparent from the context" that the new first sentence cannot reasonably apply to statutory sections defining infringing conduct, the question remains whether the addition of this new sentence changed the meaning of the second sentence of the definition without changing its words.

We see at least two possible answers to the question, neither of which is entirely satisfactory.  One interpretation would be that, by adding the new first sentence, Congress changed the meaning of the second sentence of the definition to conform to the new first sentence, without altering the words.  The language of the definition, which, prior to the addition of the new first sentence, would have been construed to apply both to sections defining infringement, and to sections specifying eligibility for registration, would change its meaning, despite the absence of any change in its words, so that the entire definition now no longer applied to the sections defining infringement.  Change of meaning without change of words is obviously problematic.

The alternative solution would be to interpret the two sentences of the statutory definition as of different scope.  The second sentence of the definition, which survived the 1988 amendment unchanged, would retain its prior meaning and continue to apply as before the

amendment to sections defining infringement, as well as to sections relating to a mark owner's eligibility for registration and for enjoyment of the protections of the Act. The new first sentence, which plainly was not intended to apply to infringements, would apply only to sections in the latter category – those relating to an owner's eligibility to register its mark and enjoy the Act's protection. Under this interpretation, liability for infringement under §§ 1114 and 1125(a) would continue, as before 1988, to require a showing of the infringer's placement of another's mark in the manner specified in the second sentence of the § 1127 definition. It would not require a showing that the alleged infringer made "bona fide use of the mark in the ordinary course of trade, and not merely to reserve a right in the mark." On the other hand, eligibility of mark owners for registration and for the protections of the Act would depend on their showing compliance with the requirements of both sentences of the definition.

We recognize that neither of the two available solutions is altogether satisfactory. Each has advantages and disadvantages. At least for this Circuit, especially given our prior *1-800* precedent, which applied the second sentence of the definition to infringement, the latter solution, according a different scope of application to the two sentences of the definition, seems to be preferable.[12]

The judges of the *1-800* panel have read this Appendix and have authorized us to state that they agree with it. At the same time we note that the discussion in this Appendix does not affect the result of this case. We assumed in the body of the opinion, in accordance with the

---

[12] We express no view which of the alternative available solutions would seem preferable if our Circuit had not previously applied the second sentence to sections of the Act defining infringement.

holding of *1-800*, that the requirements of the second sentence of the definition of "use in commerce" in § 1127 apply to infringing conduct and found that such use in commerce was adequately pleaded.  The discussion in this Appendix is therefore dictum and not a binding opinion of the court.  It would be helpful for Congress to study and clear up this ambiguity.