22-1634-cv
*1-800 Contacts, Inc. v. JAND, Inc., DBA Warby Parker*

In the
United States Court of Appeals
for the Second Circuit

_____

August Term 2022
No. 22-1634

1-800 CONTACTS, INC.,

*Plaintiff-Appellant,*

*v.*

JAND, INC., DBA WARBY PARKER,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Southern District of New York

_____

(Argued June 9, 2023; Decided October 8, 2024)

Before: CHIN, CARNEY, and LEE, *Circuit Judges.*

Plaintiff-Appellant 1-800 Contacts, Inc., appeals from a judgment entered in the United States District Court for the Southern District of New York (Castel, *J.*), granting a motion for judgment on the pleadings in favor of Defendant-Appellee JAND, Inc., d.b.a. Warby Parker. The Complaint alleges that Defendant-Appellee used Plaintiff-Appellant's trademarks—its brand name 1-800-Contacts and related variations—in keyword search advertisements in violation of the federal Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and New York State common law. Defendant-

Appellee allegedly engaged in a plan to purchase search engine keywords consisting of Plaintiff-Appellant's trademarks for use as keywords in online advertising campaigns and then designed misleading paid advertisements, so that customers searching for Plaintiff-Appellant's website by typing "1-800-Contacts" into a web browser would be diverted to Defendant-Appellee's website instead. However, Plaintiff-Appellant does not claim that Defendant-Appellee actually *used* the former's trademarks other than purchasing them as keywords in the online search engine auctions.

We now reiterate that the mere act of purchasing a search engine keyword that is a competitor's trademark does not alone, in the context of keyword search advertising, constitute trademark infringement. Upon examination of the remaining allegedly infringing components of Defendant-Appellee's search advertising campaign—i.e., the resulting advertisement itself and landing webpage linked within, neither of which displays 1-800-Contact's trademarks— we conclude that Plaintiff-Appellant failed to plausibly allege any likelihood of consumer confusion under this Circuit's test in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961). Thus, we **AFFIRM** the district court's judgment.

––––––––––––––––––––––––––

STEPHEN R. FISHBEIN, Shearman & Sterling LLP, New York, NY (Todd M. Stenerson, Brian C. Hauser, Shearman & Sterling LLP, Washington, DC; Ryan A. Shores, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC; Steven J. Joffee, Ethan J. Bercot, Michael Best & Friedrich LLP, Cottonwood Heights, UT; Thomas A. Agnello, Michael Best & Friedrich LLP, Milwaukee, WI, *on the brief*) *for Plaintiff-Appellant*.

G. ROXANNE ELINGS (L. Danielle Toaltoan, *on the brief*), Davis Wright Tremaine LLP, New York, NY, *for Defendant-Appellee*.

––––––––––––––––––––––––––

EUNICE C. LEE, *Circuit Judge*:

2

Plaintiff-Appellant 1-800 Contacts, Inc. ("1-800"), appeals from a judgment entered in the United States District Court for the Southern District of New York (Castel, *J.*), granting a motion for judgment on the pleadings in favor of Defendant-Appellee JAND, Inc., d.b.a. Warby Parker ("Warby Parker"). The Complaint alleges that Warby Parker used 1-800's trademarks—its brand name 1-800-Contacts and related variations—in keyword search advertisements in violation of the federal Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and New York State common law. Warby Parker allegedly engaged in a plan to purchase 1-800's trademarks as keywords in online advertising campaigns and then designed misleading paid advertisements, so that customers searching for 1-800's website by typing "1-800-Contacts" into a web browser would be diverted to Warby Parker's website instead. However, 1-800 does not claim that Warby Parker actually displayed or *used* the former's trademarks; it alleges only that Warby Parker purchased search engine keywords consisting of its trademarks in the online search engine auctions.

We now join the consensus view and decide that the mere act of purchasing a competitor's trademarks in the context of keyword search advertising does not constitute trademark infringement. Upon examination of the remaining allegedly infringing components of Warby Parker's search advertising campaign—i.e., the advertisement itself and landing webpage linked within—we

3

conclude that 1-800 failed to plausibly allege any reasonable likelihood of consumer confusion under this Circuit's test in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961). Thus, we **AFFIRM** the district court's judgment.

## BACKGROUND

1-800-Contacts is an online—rather than brick-and-mortar—retailer of contact lenses that consumers access solely through its website 1800contacts.com. Many consumers navigate to the website by searching for 1-800's registered trademarks ("Marks") on search engines, such as Google, and finding 1-800's webpage in the search results. These trademarks include "1800 Contacts," "1 800 Contacts," "1800contacts.com," and "1800contacts" (collectively, "1-800's Marks").

Warby Parker was originally an online retailer of eyeglasses only. In 2013, it opened brick-and-mortar stores. Then, around November 2019, Warby Parker entered the online contact lens marketplace by selling contact lenses on its website warbyparker.com. As a result, Warby Parker and 1-800 became competitors in the online sale of contact lenses. Warby Parker uses the trade name and trademark "Warby Parker."

This dispute revolves around Warby Parker's purchase at auction of keywords including 1-800's Marks in a type of internet marketing called search (or

4

keyword) advertising. We therefore begin with a brief explanation of how search advertising works. As this is an appeal from the district court's grant of a Rule 12(c) motion for judgment on the pleadings, we assume the facts alleged in the complaint to be true and draw all reasonable inferences in favor of the non-movant, 1-800. *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).

When online shoppers search for "1-800 Contacts" or variations of its trademarks by typing those terms into a search engine, they receive two main types of search results: (1) organic, or natural, results; and (2) sponsored, or paid, results—both of which provide links to webpages. The first category, organic results, includes the webpages that the "search engine's algorithm deems to be most relevant to the shopper's search." Compl. ¶ 36. The second category, paid results, are based on which advertisers paid the most to have their advertisements shown in response to the search term—also known as search advertising. *Id.* At the time of the dispute, paid results included a small designation labeling the result as an "Ad" in the top, left-hand corner.

Google Ads (formerly Google AdWords) is Google's platform through which advertisers can bid to place advertisements in Google's search results.[1]

---

[1] We focus on Google despite the existence of other search engines because 1-800's allegations are centered on Warby Parker's use of Google Ads.

Using Google Ads, an advertiser can "strategically place advertisements" in a search term's results at, or near, the top of the results page, by outbidding the competition for that term or keyword. *Id.* ¶ 42. Further, most search engines, including Google's, do not limit which keywords an advertiser can bid on. Thus, an advertiser can bid on a competitor's brand or trademarks so that the *advertiser's* ad appears in response to a consumer's search for the *competitor's* marks. For the purposes of this case, the search result for a purchased keyword contains three relevant components: (1) the advertisement copy; (2) a uniform resource locator ("URL"), i.e., website link; and (3) the landing webpage the consumer arrives at after clicking on the aforementioned URL.

## I.   1-800's Complaint Allegations

1-800's Complaint, filed in August 2021, alleges that Warby Parker's use of 1-800's Marks in search advertising constituted trademark infringement and unfair competition under the federal Lanham Act and New York State law.[2] Specifically, Warby Parker, as a new entrant into the online contact lens market,

---

[2] To establish trademark infringement and unfair competition claims under the Lanham Act, a plaintiff must show first, that "it has a valid mark that is entitled to protection," *1-800 Contacts, Inc. v. WhenU.com, Inc.*, 414 F.3d 400, 407 (2d Cir. 2005), and second, that defendant's "use in commerce" of the allegedly infringing mark is "likely to cause confusion" as to the origin, sponsorship, or affiliation of the defendant's goods with plaintiff's goods. *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 128 (2d Cir. 2009) (quoting 15 U.S.C. § 1114).

"devised a plan to trade on the great strength and goodwill of [1-800's Marks] by" engaging in a three-step plan to (1) purchase 1-800's Marks as keywords, and (2) show source-ambiguous ads to consumers searching for 1-800's website, in order to (3) direct them to a Warby Parker landing webpage that mimicked 1-800's homepage—so that consumers would believe they were actually on 1-800's official website, or at the very least, a website that was affiliated with, or approved by, 1-800. Compl. ¶ 55 (arguing that Warby Parker used "keyword advertising, ambiguous ads, and a deep-linked webpage" to "confuse consumers").[3] In other words, 1-800 accuses Warby Parker of "mislead[ing] consumers about the *source or affiliation* of the advertiser . . . to exploit the favorable reputation consumers associate with the 1 800 CONTACTS Marks." *Id.* ¶¶ 88-89 (emphasis added). Further, 1-800 argues that even if consumers were able to determine Warby Parker's lack of affiliation with 1-800 after reaching the latter's deep-linked ad page, Warby Parker still created initial-interest confusion[4] by diverting consumers

[3] Warby Parker's Google advertisement contained a "deep link" to a "unique warbyparker.com landing webpage that [wa]s different from the look and feel of Warby Parker's homepage and that feature[d] coloring and a presentation that [wa]s confusingly similar to [1-800's] website." Compl. ¶ 67.

[4] As will be discussed *infra*, initial-interest confusion is a type of consumer confusion that occurs pre-sale, in which a "consumer falsely infer[s] an affiliation between the [plaintiff's and defendant's marks]," which "provide[s] the [defendant] with [a sales] opportunity it otherwise would not have achieved, or deprive[s] the [plaintiff] of an actual [sales] opportunity." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 932 (8th Cir. 2021).

away from 1-800 to Warby Parker through its placement of paid keyword search advertisements for the 1-800 Marks. We now detail 1-800's allegations regarding each of the three steps below.

### A. Warby Parker's Bids on 1-800's Marks for Keyword Searches

First, 1-800's Complaint alleges that Warby Parker's purchase of 1-800's Marks as keywords in search engine auctions created consumer confusion. According to 1-800, "[t]he primary purpose of navigational searches is to locate a specific website." *Id.* ¶ 63. That is, when consumers conduct "navigational searches using a keyword corresponding to a specific business, their reasonable expectation is to use the search engine as a shortcut to 'navigate' directly to that company's website." *Id.* Based on this understanding of navigational searches, 1-800 argues that Warby Parker's bids on 1-800's Marks thwarted consumers' reasonable expectations when they searched for terms like "1800 Contacts" or "1800contacts.com" hoping to reach 1-800's website, only to find Warby Parker's advertisement at the top of the search results page. Such a strategy allegedly was devised "to confuse and mislead [1-800's] consumers" by "trad[ing] off 1-800 Contacts' brand name and reputation through unauthorized bidding on 1-800 Contacts' trademarks as search engine keywords." *Id.* ¶ 5. In other words, 1-800 argues that Warby Parker "deliberate[ly] use[d] [1-800's Marks] to place

8

ambiguous ads that generate source, sponsorship, or initial interest confusion."

*Id.* ¶ 6.

### B. The Nature of Warby Parker's Ads

Next, the Complaint claims that Warby Parker's ads that appear on the search results page were intentionally designed to be ambiguous and to confuse consumers regarding the source of the ads. To support its claim, 1-800 provided a July 26, 2021 screenshot of the Google search results page, in which Warby Parker's ad is the first result for the search term "1 800 contacts." Compl. Ex. 2. The first line of the ad consists of the bolded word "Ad" and the www.warbyparker.com domain name in black, while the second line uses slightly larger blue font and contains the text: "15% Off First Contacts Order – 90 Daily Contacts for Only $55." *Id.* 1-800 argues that because the ad's first line appeared in less prominent font than the ad's second line, consumers who only skimmed the search results, especially on a mobile phone, may have overlooked the first line identifying the result as a Warby Parker advertisement. Moreover, the ad's second line, with the "larger, brighter-colored" text, "fail[ed] to identify Warby Parker" and did not "clearly indicate that the website is *not* owned by, or affiliated with" 1-800. Compl. ¶¶ 60-61. The screenshot of the search results page is pictured below:



Compl. Ex. 2.  On the basis of the allegations above, 1-800 surmises that Warby Parker "knowingly and intentionally present[ed] . . . consumers with ads that appear[ed] to be from 1-800 Contacts or an approved affiliate, licensee, or associate."  Compl. ¶ 8.

## C. The Landing Webpage Linked to Warby Parker's Ads

Lastly, 1-800 claims that Warby Parker further "magnifie[d] this confusion"

created by the aforementioned keyword bidding and ad placements, by including a URL in its paid advertisements that, when clicked upon, directed Google searchers to a "deep link"—i.e., a link to a page other than Warby Parker's homepage—within the Warby Parker website. *Id.* ¶ 66. 1-800 refers to the advertisement's landing webpage as the "Deep Linked Ad Page." *Id.* Further, 1-800's brand is uniquely associated with the color blue, which has been "continuously and prominently featured" on its website since 1996. *Id.* ¶ 68. 1-800 argues that Warby Parker "usurp[ed]" the look and feel of 1-800's website by intentionally using a layout and color scheme in its Deep Linked Ad Page to "further confus[e] consumers into believing [that] they have arrived" at 1-800's website or an affiliated site. *Id.* ¶ 69; *see also id.* ¶ 71 (explaining that Warby Parker "revamped the Deep Linked Ad Page color scheme and layout to even more closely resemble the updated 1800contacts.com website homepage layout adopted in April 2020"). To make this point, 1-800's Complaint provides screenshots of 1-800's homepage to compare with Warby Parker's Deep Linked Ad Page. *Compare infra* Figure 1 (1-800's homepage), *with infra* Figure 2 (Warby Parker's "Deep Linked Ad Page" for consumers who search 1-800's Marks).

11

**Figure 1** (1-800's standard homepage):



*Id.* ¶ 68.   **Figure 2** (Warby Parker's "Deep Linked Ad Page," shown in searches for

1-800's Marks):



*Id.* ¶ 70.

1-800 compares the two webpage screenshots above and highlights that

Warby Parker's Deep Linked Ad Page contained a blue rectangular box, *see supra* Figure 2, which was "nearly the same shade of light blue" as the box on the 1-800 homepage, *see supra* Figure 1. *Id.* ¶ 70. Moreover, both blue boxes contained images of contact lens boxes and a discount offer. *Compare id.* ¶ 68 (Figure 1 displaying screenshot of 1-800's homepage with the text, "Get 20% off your first order," and partial images of four boxes of contact lenses) *with id.* ¶ 70 (Figure 2 displaying screenshot of Warby's Deep Linked Ad Page with the offer, "Get 15% off your first contacts order, plus free shipping," and images of ten boxes of contact lens).

Additionally, 1-800 points out that Warby Parker's Deep Linked Ad Page had a different look and feel than either (1) Warby Parker's landing webpage provided in paid ads for users who searched "Warby Parker contacts" (the "Non-1-800 Landing Webpage") or (2) Warby Parker's standard homepage. *Compare supra* Figure 2 (Warby Parker's Deep Linked Ad Page with rectangular light blue box and discount offer), *with infra* Figure 3 (Warby Parker's Non-1-800 Landing Webpage without rectangular light blue box and no discount offer), *and infra* Figure 4 (Warby Parker's homepage with light brown background).

13

**Figure 3** (Warby Parker's Non-1-800 Landing Webpage):



*Id.* ¶ 75.  **Figure 4** (Warby Parker's standard homepage):



*Id.* ¶ 76.  1-800 argues that the differences in color and layout between Warby

Parker's Deep Linked Ad Page and its Non-1-800 Landing Webpage further

evidences Warby Parker's intent to "misdirect[] consumers who type 1-800 Contacts' domain name into the search bar . . . and to divert them away" from 1-800 to Warby Parker. *Id.* ¶ 80 (emphasis omitted).

## II.    District Court Decision

On June 27, 2022, the district court granted Warby Parker's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) in its entirety. To reach its conclusion, the district court applied this Circuit's *Polaroid* test to determine whether 1-800 had adequately pleaded that Warby Parker's use of 1-800's Marks created a likelihood of consumer confusion. *See 1-800 Contacts, Inc. v. JAND, Inc.*, 608 F. Supp. 3d 148, 154–55 (S.D.N.Y. 2022) (explaining the eight-factor balancing test in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961)). The district court reasoned that, although 1-800's Marks were strong and despite indications of "bad faith" in Warby Parker's design of the Deep Linked Ad Page, these factors alone were insufficient to establish a likelihood of consumer confusion. *Id.* at 157-58. Rather, the district court found one of the eight factors—the similarity-of-the-marks factor—to be dispositive to its analysis because Warby Parker's name was clearly displayed in both the paid Google advertisements and the Deep Linked Ad Page. *See id.* at 157. Accordingly, the district court held that it was not plausible for "reasonably sophisticated internet

15

consumers to be confused as to whether they ha[d] navigated to, and [were] purchasing contacts" from 1-800 instead of Warby Parker because Warby Parker's mark—"Warby Parker"—was entirely dissimilar from 1-800's Marks—"1800 Contacts," "1 800 Contacts," "1800contacts.com," and "1800contacts." *Id.* at 158. 1-800 timely appealed.

## DISCUSSION

### I. Standard of Review

"We review *de novo* a district court's decision to grant a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c)." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015)). A party may move for judgment on the pleadings after the pleadings are closed, but early enough not to delay a trial. *Id.* When determining a Rule 12(c) motion, courts are limited to reviewing: (1) the non-movant's pleadings; (2) the documents that are attached to, integral to, or incorporated by the pleadings; and (3) judicially noticeable extrinsic evidence. *Id.* at 306.

The legal standard for granting a Rule 12(c) motion is identical to that for granting a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). That is, the "complaint must

16

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lively*, 6 F.4th at 301 (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)). Further, "we are not to give effect to a complaint's assertions of law or legal conclusions couched as factual allegations; we are to accept well pleaded factual assertions as true; and we are to draw all reasonable factual inferences in favor of the plaintiff." *Lynch*, 952 F.3d at 75–76.

## II.    Applicable Law

### A.    Trademark Infringement and Unfair Competition

"The Lanham Act defines a trademark as 'any word, name, symbol, or device, or any combination thereof' that a manufacturer uses to distinguish the manufacturer's goods from those manufactured or sold by others and to 'indicate the source of the goods.'" *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 135 (2d Cir. 2023) (per curiam) (quoting 15 U.S.C. § 1127). To sufficiently state claims for trademark infringement and unfair competition under the Lanham Act, the plaintiff must show first, that its mark is protected, *see 1-800 Contacts, Inc. v. WhenU.com*, 414 F.3d 400, 407 (2d Cir. 2005), and second, that the defendant's "use in commerce" of the allegedly infringing mark would "likely cause confusion" as to the origin, sponsorship, or affiliation of the defendant's goods with plaintiff's goods. *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 128 (2d Cir. 2009) (quoting 15

U.S.C. § 1114).  "[L]iability for trademark infringement under New York law [largely] mirrors liability under the Lanham Act."  *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 91 n.13 (2d Cir. 2020).[5]

There are two types of consumer confusion at issue in this case— "sponsorship confusion" and "initial-interest confusion."  Appellant's Br. at 25. First, to sufficiently allege sponsorship confusion, "a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. [Rather,] [t]he [consumer]'s belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."  *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005) (quoting *Dall. Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979)).

Separately, initial-interest confusion, also known as pre-sale confusion, creates initial customer interest "even though no actual sale is finally completed as a result of the confusion."  3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.6 (5th ed. 2024).  Such confusion "may result in the consumer falsely inferring an affiliation between the [plaintiff's goods] and

---

[5] New York law additionally requires a "showing of bad faith."  *Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 485 (2d Cir. 2005).  On appeal, 1-800 presented the same arguments for both its federal Lanham Act claims and New York common law claims, and we accordingly conclude that they all fail for the reasons explained *infra*.

[defendant's goods], provide the [defendant] with an opportunity it otherwise would not have achieved, or deprive the [plaintiff] of an actual [business] opportunity." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 932 (8th Cir. 2021). In particular, "[i]n the context of the internet, the concern [with initial-interest confusion] is that potential customers of one website will be diverted and distracted to a competing website." *Alzheimer's Disease & Related Disorders Ass'n, Inc., v. Alzheimer's Found. of Am.*, 307 F. Supp. 3d 260, 286 (S.D.N.Y. 2018) (Nathan, J.) (internal quotation marks omitted); *see also Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1057 (9th Cir. 1999) ("[E]ven where people realize, immediately upon accessing [the defendant's website] that they have reached a site operated by [the defendant] and wholly unrelated to [the plaintiff], [the defendant] will still have gained a customer by appropriating the goodwill that [plaintiff] has developed."). We require a showing of intentional deception to sufficiently plead internet-related initial-interest confusion because "consumers diverted on the Internet can more readily get back on track than those in actual space." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 462 n.13 (2d Cir. 2004).

### B.    *Polaroid* **Test for Likelihood of Confusion**

After ascertaining the type of consumer confusion alleged, we apply the eight-factor *Polaroid* test to assess whether a plaintiff has sufficiently pleaded

"likelihood of confusion." 287 F.2d at 496; *see also Alzheimer's Disease*, 307 F. Supp. 3d at 285 (noting that "it is important to clarify upfront the specific type of consumer confusion alleged by the [plaintiff]" so that the *Polaroid* test can be "evaluated in the context" of whether that type of confusion was likely to have occurred). "The eight factors are: (1) strength of the trademark; (2) similarity between the two marks; (3) proximity of the products and their competitiveness with one another; (4) likelihood the prior owner may 'bridge the gap' in the markets for their products; (5) evidence of actual consumer confusion; (6) the defendant's good faith in adopting its imitative mark; (7) quality of the defendant's product compared with the plaintiff's product; and (8) sophistication of the buyers." *Vans, Inc.*, 88 F.4th at 136. "No single factor is dispositive, nor is a court limited to consideration of only these factors." *Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 130 (2d Cir. 2004).

Importantly, "each factor must be evaluated in the context of how it bears on the *ultimate question* of likelihood of confusion as to the source of the product." *Id.* (emphasis added) (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986)); *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) ("The application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the

20

products in their totality, consumers are likely to be confused." (internal quotation marks omitted)). In other words, "[t]he crucial issue . . . is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Savin Corp.*, 391 F.3d at 456 (second alteration in original) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 46 (2d Cir. 1978)).

## III. Application of Lanham Act Claim Elements and the *Polaroid* Test

As an initial matter, Warby Parker's practice of bidding on competitors' trademarks during search advertising auctions is a permissible and standard industry practice. *See, e.g.*, *Rescuecom Corp.*, 562 F.3d at 125–27 (describing how an advertiser can bid on a competitor's brand name and trademark as keywords in search auctions); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 151 (4th Cir. 2012) (describing how "an advertiser will try to outbid its competitors for the top positions in order to maximize the number of clicks on the advertiser's text ads"). As 1-800 Contacts conceded at oral argument, there is no prohibition on such search advertising. *See* Oral Arg. at 5:15–6:30. This well-known marketing strategy—standing alone—cannot support a claim of trademark infringement absent additional use of 1-800's Marks. *See, e.g.*, *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013); *Alzheimer's Disease*, 307 F. Supp. 3d at 287;

21

*cf. Select Comfort Corp.*, 996 F.3d at 931 (holding that the combined use of a competitor's trademarks in search advertising, website addresses, and graphic and text advertising materials could support a claim of trademark infringement); *Australian Gold, Inc., v. Hatfield*, 436 F.3d 1228, 1240 (10th Cir. 2006) (holding that the use of a competitor's trademarks on a company's own website, in addition to bidding in search advertising auctions, violated the Lanham Act). It is within that context that the elements of 1-800's Lanham Act claims must be assessed.

As outlined above, three components to a search advertising campaign are relevant for our analysis of whether 1-800 has sufficiently alleged trademark infringement by Warby Parker: *first*, the defendant's purchase of a competitor's marks as keywords; *second*, the ads placed on the search results page for the competitor's marks; and *third*, the defendant's landing webpage to which its ads are linked. Thus, the central question in this case is whether 1-800 has sufficiently alleged a likelihood of confusion arising from Warby Parker's use of 1-800's Marks (i.e., 1800 Contacts," "1 800 Contacts," "1800contacts.com," and "1800contacts") in the keyword bidding process, the search ads, and/or the linked landing webpage.

Before we reach this central question, however, we note that to establish a Lanham Act violation a plaintiff must show its "*bona fide* use," *Rescuecom Corp.*, 562 F.3d at 132 (quoting 15 U.S.C. § 1127), of a "valid protectable mark," *Vans, Inc.*, 88

F.4th at 136. Here, there is no dispute that 1-800's Marks are federally registered and protected and that 1-800 has used them in more than a token fashion. *See Rescuecom Corp.*, 562 F.3d at 138; *see also Vans, Inc.*, 88 F.4th at 136 (noting that federal registration is "*prima facie* evidence that [the plaintiff's marks] are valid and protectable"). Further, in the search advertising context, an alleged infringer's purchase of a keyword comprising a competitor's trademark constitutes a "use in commerce" of such trademark under the Lanham Act. *See Rescuecom Corp.*, 562 F.3d at 127 (holding that complaint regarding Google's AdWord's recommendation of plaintiff's trademark to plaintiff's competitors "adequately plead[ed] a use in commerce" under the Lanham Act).

1-800 alleges that Warby Parker made an infringing use of 1-800's Marks in the first component of its search advertising campaign: the keyword purchase. However, as described above, the mere act of purchasing a competitor's trademarks as keywords in the search advertising context does *not* constitute trademark infringement or unfair competition. *See id.* at 130. Warby Parker's purchase of 1-800's Marks, standing alone, does not infringe 1-800's Marks because "a defendant must do more than use another's mark in commerce to violate the Lanham Act." *Id.* The statute requires a showing that the defendant's use caused consumer confusion. *See* 15 U.S.C. § 1114(1) ("Any person who shall,

23

without consent of the registrant—[] use in commerce any . . . copy . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods . . . in connection with which such use is likely to cause confusion . . . shall be liable in a civil action by the registrant . . . .").

Below, we apply the *Polaroid* factors *de novo* to the other two components of Warby Parker's ad campaign—its search ads and the linked landing webpage—which 1-800 alleges violated the Lanham Act. We conclude that 1-800 has failed to sufficiently plead that Warby Parker's advertising plan was likely to confuse consumers at any point in the sales process because 1-800 does not claim that Warby Parker actually used the former's Marks other than by buying them as keywords in the search engine auctions, and such use alone does not create a likelihood of consumer confusion.[6]

---

[6] To the extent 1-800 also alleges that Warby Parker committed trademark infringement by copying the "look and feel" of 1-800's website, that is really a trade dress claim. Such a claim would require an additional showing by 1-800 that its website design is "distinctive." *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) (explaining that in a trade dress claim a mark must be "distinctive" and not "generic" in order to be protectable, either by being inherently distinctive or by "'acquir[ing]' distinctiveness by "developing 'secondary meaning' in the public mind"); *see also id.* at 217 ("[I]f (and only if) the plaintiff's trademark is 'distinctive' within the meaning of trademark law and is therefore valid and protectable," does the court then assess whether the defendant's use of plaintiff's protected mark is likely to cause consumer confusion.). Here, 1-800 did not plead or argue that the "look and feel" of its website is a protectable mark. Rather, 1-800's Complaint is focused on Warby Parker's

**A.** **Strength of the Marks, Relative Competition and Proximity, Bridging the Gap, Relative Quality, and Good Faith**

The district court held that four of the eight factors in the *Polaroid* test—the strength of the Marks, the products' competitive proximity, the products' relative quality, and good faith—all favored 1-800. The district court also concluded that the bridging-the-gap factor was irrelevant. Although 1-800 does not challenge the district court's analysis of these five factors, we nevertheless have reviewed each factor *de novo* and agree with the district court's conclusion and reasoning as to each. *See JAND, Inc.*, 608 F. Supp. 3d at 155–58. We now turn to analysis of the remaining factors.

**B.** **Similarity of the Marks**

1-800 contends that the district court erred in choosing *which* marks to compare for the similarity-of-the-marks factor of the likelihood of confusion test. In the decision below, the district court compared the mark Warby Parker used "after the search results . . . [we]re displayed to the consumer" (i.e., Warby's own mark) and concluded that it was "substantially different" from 1-800's Marks. *JAND, Inc.*, 608 F. Supp. 3d at 157. On appeal, 1-800 primarily argues that

---

use of its "distinctive '1 800 CONTACTS' trademark and variations thereof (collectively, the 'Marks')." Appellant's Br. at 3 (quoting Compl. ¶¶ 1, 21–22). Accordingly, the Court focuses only on 1-800's allegations over Warby Parker's use of 1-800's Marks.

"consumers [had to] physically type 1-800's Marks (including the 1800contacts.com domain name) into the search or address bar . . . to generate [the] search results" page that displayed the Warby Parker ads, and thus this typing in of the mark by consumers should be the point of comparison. Appellant's Br. at 52.[7] Under this theory, 1-800 argues, the district court should have concluded that the similarity-of-the-marks factor favored 1-800, "because the [m]arks Warby [Parker] use[d] and bid[] on to generate its advertisements [we]re *identical* to 1-800's Marks." *Id.* at 49. We disagree.

First, as noted above, Warby Parker's only alleged *use* of 1-800's Marks was in the initial keyword bid. Despite 1-800's emphasis on the allegedly nefarious

---

[7] 1-800 also argues that the district court should have compared 1-800's Marks with the "keyword or metatag used by" Warby Parker to place the paid ad, "even if that keyword or metatag remain[ed] hidden from the consumers." Appellant's Br. at 50–51. "Metatags are HTML code not visible to Web users but used by search engines in determining which sites correspond to the keywords entered by a Web user." *Id.* at 51 n.30 (alteration adopted) (quoting *Brookfield Commc'ns., Inc.*, 174 F.3d at 1061 n.23). However, to the extent 1-800 is raising a likelihood of confusion argument with respect to metatags, 1-800's Complaint is devoid of claims regarding metatags and thus lacks allegations upon which to infer such an argument, even at the pleadings stage. As a result, the Court will not address 1-800's metatag argument, as it was not raised below. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." (alteration adopted) (quoting *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006)). But even if we consider that argument, it fails. As we held in *WhenU*, "as a matter of law," a defendant's use of a plaintiff's trademark in an "unpublished directory of terms" does not constitute a trademark infringement under the Lanham Act. 414 F.3d at 403.

nature of Warby Parker's keyword bidding activities, this well-known internet marketing strategy—by itself—does not support a claim of trademark infringement absent *additional* use of 1-800's Marks. *See, e.g., Lens.com, Inc.*, 722 F.3d at 1241 (affirming district court's ruling that "merely purchasing such a keyword cannot, on its own, give rise to liability for infringement" under the Lanham Act); *Alzheimer's Disease*, 307 F. Supp. 3d at 287 ("[C]ourts have repeatedly found that the purchase of a competitor's marks as keywords alone, without additional behavior that confuses consumers, is not actionable."). Thus, although the marks Warby Parker purchased at auction for use as keywords are identical to 1-800's Marks, this alleged use—including the consumer's component of typing the keyword into a search engine—does not violate the Lanham Act and is not the relevant comparison point for the similarity-of-the-marks factor.

Rather, in search advertising, "'the labeling and appearance of the advertisements and the surrounding context on the screen displaying the results page' [is] a critical factor" in assessing likelihood of confusion—especially "when the entry is clearly labeled as an advertisement and clearly identifies the source." *Lens.com*, 722 F.3d at 1245 (quoting *Network Automation v. Advanced Sys. Concepts*, 638 F.3d 1137, 1154 (9th Cir. 2011)). In other words, in the search advertising context, the similarity-of-the-marks factor should be assessed as it relates to the

paid advertisement's appearance on the result page. *See Lens.com*, 722 F.3d at 1245 (holding that "the similarity of the [consumer's] search term and [the plaintiff's] mark is of minor relevance"); *see also Alzheimer's Disease*, 307 F. Supp. 3d at 291 ("With respect to the [plaintiff's] claim regarding [the defendant's] purchase of [the plaintiff's] Marks as keywords and metatags, the proper comparison is between the resulting ads for [the parties'] advertisements or other search results."); *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 159 (E.D.N.Y. 2011) (explaining that in the AdWords context, courts must consider the degree of similarity between the plaintiff's marks and the defendant's paid advertisements as they appear on the search results page).

Here, 1-800 does not allege that Warby Parker used 1-800's Marks in any components aside from the preliminary keyword purchase. Indeed, 1-800's own pleadings show that the word "Ad" is displayed directly next to Warby Parker's domain name at the top of its paid search ad in bold; the linked URL contains only the www.warbyparker.com domain name, *see* Compl. Ex. 2; and the alleged "Deep Linked Ad Page" displays Warby Parker's mark at the top of the webpage, Compl. ¶ 70. Further, as the district court correctly observed, Warby Parker's own marks do not contain any reference to numbers, phone numbers, or a 1-800 Contacts-branded product. We therefore agree with the district court's conclusion "that

28

the marks at issue are substantially different." *JAND, Inc.*, 608 F. Supp. 3d at 157.[8]

Consequently, we find that the similarity-of-the-marks factor entirely favors Warby Parker.

## C.    Actual Confusion

Regarding the actual confusion factor, 1-800 argues that the district court ignored its plausible allegations that Warby Parker's "bad-faith plan" did, in fact, create confusion among consumers as to whether 1-800 was affiliated with Warby Parker either pre-sale, at the point of sale, or post-sale.    Appellant's Br. at 57.    We disagree.

Although other methods might suffice, Lanham Act claimants typically present evidence of actual confusion through consumer surveys.    *See Star Indus.*,

---

[8] We are not holding that a plaintiff can never allege some sort of violation of the Lanham Act where the defendant's only use of the plaintiff's mark is in the keyword purchase. For example, if Warby Parker's landing webpage mimicked 1-800's website such that it was a mirror image of 1-800's site but stopped just short of using 1-800's brand name and related Marks, 1-800 could have a potential trade dress infringement claim, and our analysis would likely weigh the similarity-of-the-marks factor much more heavily in 1-800's favor.    *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997) ("[T]here is no question that trade dress may protect the 'overall look' of a product."); *FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*, No. 14-CV-3685 (SJF), 2015 WL 4162757, at *9 (E.D.N.Y. July 8, 2015) (collecting cases to explain that although the issue is relatively novel, district courts have recognized that a website's "look and feel" can constitute protectable trade dress).    However, 1-800 did not bring a trade dress claim in this case, and therefore the question is not before us.    *See supra* note 6 ("1-800 did not plead or argue that the 'look and feel' of its website is a protectable mark.").

*Inc.*, 412 F.3d at 388 (noting that plaintiff's "failure to present its own consumer survey weighs against a finding of [actual] consumer confusion"). 1-800's Complaint did not refer to any survey—or even anecdotal—evidence from consumers demonstrating actual confusion. Rather, on appeal, 1-800 cites examples from the Complaint that allege that Warby Parker's "source-ambiguous" ads and its landing webpage's "mimicry" of 1-800's website caused actual consumer confusion. *See* Appellant's Br. at 57 n.36 (citing, for example, Compl. ¶ 5 (alleging that Warby Parker's scheme "exposes consumers to source-ambiguous Warby Parker advertisements and a deep linked webpage that confuses consumers"); Compl. ¶ 9 (alleging that Warby Parker's "mimicry" of 1-800's website "causes consumers who view th[e Warby] webpage to reasonably—but mistakenly—conclude that the webpage they have reached is 1-800" or an affiliated company)). However, these allegations of "actual confusion" are conclusory at best. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009) (holding that courts are not required "to credit a complaint's conclusory statements without reference to its factual context"); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (explaining that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient for surviving a motion to dismiss (alteration adopted) (quoting *Iqbal*, 556 U.S. at 678)).

30

First, despite 1-800's allegations that Warby Parker's ads were "source-ambiguous," 1-800's own screenshot of the ad shows that it is clearly marked as an "Ad" in the top left corner, clearly displays Warby Parker's own domain name, and contains no use of 1-800's Marks or anything remotely similar to 1-800's Marks:



Compl. Ex. 2. Indeed, the screenshot shows that just below Warby Parker's paid ad is 1-800's own paid ad, which, in contrast, prominently displays 1-800's Marks twice, and clearly proclaims that this result is 1-800's "Official Site." *Id.* Thus, 1-800 does not allege actual confusion as to the source or affiliation of Warby Parker's Google ad nor does it allege facts from which we could plausibly infer actual confusion.

Second, 1-800's screenshot of the Deep Linked Ad Page indicates that the

31

page prominently displays Warby Parker's own mark, includes a light blue banner which offers a 15% discount with images of ten boxes of contact lenses, and is devoid of 1-800's Marks:



Compl. ¶ 70.   In contrast, 1-800's website prominently displays 1-800's Marks, contains an offer for a 20% discount, and displays only four partial images of boxes

of contact lenses:



Compl. ¶ 68.

Generally, a lack of consumer survey data is "evidence that actual confusion cannot be shown." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996). Nevertheless, "a [court] may still conclude that actual confusion exists . . . , so long as there is other evidence of actual confusion." *Id.* To prevail on the actual confusion factor at this initial pleadings stage, 1-800 must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lively*, 6 F.4th at 301 (alteration in original) (quoting *Lynch*, 952 F.3d at 75). Given the absence of allegations of actual confusion, a comparison of the website screenshots shown above does not lead to a plausible inference that "an appreciable number" of consumers who reach Warby Parker's

33

Deep Linked Ad Page would *actually* be confused by a partial light-blue color and a discount offer (15% as opposed to 1-800's 20%) into thinking Warby Parker's webpage is sponsored by or affiliated with 1-800. *Savin*, 391 F.3d at 456 (quoting *Mushroom Makers*, 580 F.2d at 46).

Thus, we conclude that the actual confusion factor favors Warby Parker.

**D.      Sophistication of the Consumer**

As to the final factor, 1-800 contends that the district court erred by making impermissible factual findings regarding consumer sophistication at the pleadings stage.   In the Complaint, 1-800 alleges that the relevant consumers' lack of familiarity with search advertising and sponsored ads made them susceptible to being confused by Warby Parker's Google ads.   According to 1-800, the decision below completely ignored 1-800's plausible allegations that "online consumers are equivalent to ordinary retail customers in the public at-large, who typically do not bring any heightened sophistication to the marketplace," and that these "ordinarily sophisticated" customers would have been especially confused by Warby Parker's paid ads because the ads did not disavow an affiliation with 1-800. Appellant's Br. at 39.

First, we agree with 1-800 that the district court erred in determining that the relevant consumer base was "reasonably sophisticated" because this assumed

facts outside of the Complaint. *See JAND, Inc.*, 608 F. Supp. 3d at 159 (district court discounting the likelihood that 1-800 consumers would "mistakenly" click on a Warby Parker paid search result and assuming that any such consumers would thoroughly review Warby Parker's website and not be confused). To be clear, although 1-800 argues on appeal that the district court ignored its well-pleaded allegations that "an appreciable number of ordinarily sophisticated consumers" would be confused by Warby Parker's actions, Appellant's Br. at 39, 1-800 did not make any explicit allegations regarding consumer "sophistication" in its Complaint. *See* App'x 9–109 (no use of the word "sophisticated" or "sophistication" in Complaint). Nevertheless, the Court still concludes that the district court erred by substituting its own facts regarding consumer sophistication where 1-800 did not allege any. *See Lively*, 6 F.4th at 306 (explaining that courts are limited to reviewing the non-movant's pleadings when considering a motion for judgment on the pleadings).

Second, the district court also erred by substituting 1-800's plausible theory of initial-interest confusion with point-of-sale confusion in its assessment of the consumer-sophistication factor. *See JAND, Inc.*, 608 F. Supp. 3d at 159 ("[E]ven assuming that some consumers will mistakenly click on a Warby Parker paid search result and inadvertently navigate to Warby Parker's page, these consumers

would then take time to meaningfully review the contents and layout of the website before taking any further action."). The district court's assumption that online consumers would "meaningfully review" Warby Parker's webpage before they took any actions, *see id.*, ignores this Circuit's case law holding that in the search advertising context, actionable initial-interest confusion can occur if a defendant deceptively diverts the plaintiff's consumers to the defendant's site by misusing plaintiff's marks. *See Savin Corp.*, 391 F.3d at 462 n.13.

Accordingly, upon *de novo* review of this factor, we hold that 1-800's allegations about the sophistication of consumers engaged in navigational searches raised a plausible inference that the relevant consumer base *could* be susceptible to initial-interest and affiliation confusion. Accordingly, we decide that the consumer-sophistication factor slightly favors 1-800.

\* \* \*

Viewing the *Polaroid* factors as a whole, 1-800's Complaint fails to plausibly allege that consumers are likely to be confused by any portion of Warby Parker's search advertising plan. We recognize that "the likelihood of confusion test is a fact-intensive analysis that ordinarily does not lend itself to a motion" for judgment on the pleadings. *Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006) (Chin, *J.*). However, "district courts can and do

properly dismiss [trademark infringement] claims when the allegation of consumer confusion is implausible, and we have affirmed dismissals in such cases." *E.A. Sween Co. v. A&M Deli Express Inc.*, 787 F. App'x 780, 782–83 (2d Cir. 2019) (summary order). Here, the pleadings failed to plausibly allege that Warby Parker used 1-800's Marks *anywhere* during the search advertising process outside of its purchase at the initial, permissible keyword auction. Notably, Warby Parker did not use 1-800's Marks in the paid advertisement displayed on the search results page, in the domain name of the URL linked in the paid advertisement (www.warbyparker.com), or on the landing webpage displayed to consumers who clicked on the URL in the paid advertisement. Nor did 1-800 plausibly allege that Warby Parker used any other *protectable* marks in these remaining components of the search advertising campaign. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding*, 696 F.3d 206, 216 (2d Cir. 2012) (explaining that a mark must be "distinctive" in order to be protectable under the Lanham Act). Thus, the dissimilarity of the marks factor is dispositive in this case; 1-800 has not adequately alleged likelihood of consumer confusion. *See Nat. Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 579 (2d Cir. 2005) ("[I]n an appropriate case, the 'similarity of the marks' factor can be dispositive." (quoting *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000))); *Nabisco, Inc.*, 220 F.3d at 48 (holding that the marks

37

in the case were so dissimilar as to outweigh all other factors); *Brookfield Commc'ns*, 174 F.3d at 1054 ("Where the two marks are entirely dissimilar, there is no likelihood of confusion.").

Accordingly, we affirm the district court's grant of Warby Parker's motion for judgment on the pleadings and its dismissal of the Complaint.

## CONCLUSION

The judgment of the United States District Court for the Southern District of New York is **AFFIRMED**.